# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LINCOLN BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 01112 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CHICAGO BOARD OF EDUCATION; | ) | |
| BARBARA BYRD-BENNETT, in her official | ) | |
| capacity as Chief Executive Officer of | ) | |
| Chicago Public Schools; and | ) | |
| GREGORY MASON, in his individual and | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lincoln Brown, a middle-school teacher at Murray Language Academy, brings this lawsuit under 42 U.S.C. § 1983 against the Chicago Board of Education, CEO Barbara Byrd-Bennett of the Chicago Public Schools,[1] and Principal Gregory Mason of Murray Language Academy, alleging that Defendants violated his constitutional rights.[2] As detailed below, Brown alleges that he led a discussion, in his sixth-grade grammar class, on one of the most offensive words in the English language—"nigger." Brown says that he was suspended without pay for leading that discussion, and claims that the suspension violated his right to free speech and his

---

[1]The Clerk is directed to substitute the current Chief Executive Officer of the Chicago Public Schools, Barbara Byrd-Bennett, in place of the former CEO, Jean-Claude Brizard.

[2]This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

right to due process.[3] Brown sues Byrd-Bennett in her official capacity as the CEO of the Board, and Mason both in his individual capacity and in his official capacity as the principal of Murray. Defendants move to dismiss all claims [R. 16], arguing that the complaint does not state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). For reasons explained more fully below, the motion is granted in part and denied in part.

## I. Background

In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations. *Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2079 (2011). Lincoln Brown is a middle-school teacher at Murray Language Academy and an employee of the Chicago Board of Education. R. 11, Compl. at 1. On October 4, 2011, at the beginning of a grammar exercise in Brown's sixth-grade class, Brown noticed some of his students arguing over a note, which the students were passing around, containing offensive rap lyrics. *Id.* ¶ 5. Brown collected the note and read a part of it aloud to demonstrate the bullying nature of the words. R. 11-1, Pl.'s Exh. A at 1. He then

---

[3]To be precise, on the First Amendment claim, the Fourteenth Amendment incorporates the First Amendment free-speech right against state and local government officials. On the due-process claim, Brown mistakenly invokes the Fifth Amendment right to due process as incorporated against the states by the Fourteenth Amendment, *see* R. 11, Compl. ¶ 27, when he really means to sue under the Fourteenth Amendment. The Fifth Amendment's due-process right is not incorporated against the states because the Fourteenth Amendment has its own Due Process Clause. *See Scott v. City of Chicago*, 2010 WL 1433313, at *5 (N.D. Ill. Apr. 8, 2010); *see also Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"). So the Court will treat his due-process claim as really brought under the Fourteenth Amendment.

explained to the students that, although he listened to rap music, he did not listen to the type of rap that contained offensive and inappropriate language, including racial stereotypes and the degradation of women. *Id.*

When students asked what he meant, Brown decided to defuse the situation by explaining the controversial use of the "N" word in rap music and society at large. *Id.* Brown explained that the word "nigger" was distasteful and historically offensive to African Americans, and that the use of that word by some African Americans is viewed with disgust by others. *Id.* at 1-2. The discussion eventually touched on the racial profiling of Chicago cab drivers. *Id.* at 2. After class, Brown approached the two students involved in the initial dispute, and Brown resolved any lingering issues between the two students. *See id.* Certain parts of the classroom discussion were witnessed by Gregory Mason, the principal of Murray Language Academy, who had stopped in during Brown's class. R. 11-3, Pl.'s Exh. C at 1-2.

Around two weeks after the incident, on October 17, Principal Mason delivered a "Notice of Pre-Discipline Hearing" to Brown. Compl. ¶ 6. The Notice stated that Brown had violated sections 3-3 and 3-17 of the Chicago Public Schools Policy Manual. *Id.* ¶¶ 7-8. Section 3-3 prohibited the use of "verbally abusive language to or in front of [a] student." *Id.* ¶ 7; R. 11-3, Pl.'s Exh. C at 1. Section 3-17 prohibited teachers from:

> [v]iolating School rules, Board rules, policies or procedures that result in behaviors that disrupt the orderly educational process in the classroom, in the school, and may occur on or off the school grounds or assigned work location. Any cruel, immoral, negligent, or criminal conduct or communication to a student, that caused psychological or physical harm or injury to a student.

3

Compl. ¶ 8. Included in the Notice was Principal Mason's description of his memory of the events, his first-hand account of Brown's use of the word "nigger," and Mason's subsequent conversations with students who had witnessed the exchange. *Id.* ¶ 9; Pl.'s Exh. C at 1-2.

Brown's disciplinary hearing took place around a week later, on October 25. Compl. ¶ 11. Then, around two weeks after the hearing, on November 10, Brown received a Notice of Disciplinary Action that concluded that Brown had violated Section 3-3 by "[u]sing verbally abusive language to or in front of students." *Id.* ¶ 12; R. 11-5, Pl.'s Exh. E at 1.[4] The Notice of Disciplinary Action imposed a five-day suspension without pay, and included the following instruction:"Do not use the word "N------" with students at Murray at any time; whether a 'teachable moment' or not; the word is not appropriate for this age group." Compl. ¶ 12; Pl.'s Exh. E at 1.

Within a week, Brown filed an appeal of the suspension. Compl. ¶ 15. The appeal was filed with the Director of Employee Relations. *Id.* After a hearing with the Office of Employee Relations, the appeal was denied in February 2012. *Id.* ¶ 16-17. Brown brought this federal lawsuit to overturn the five-day suspension, which was without pay.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled

---

[4]The attached exhibit has Principal Mason signing the Notice of Disciplinary Action on November 14, 2011. This discrepancy in dates does not affect the analysis.

to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

## III. Analysis

### A. Official Capacity Claims Against Byrd-Bennett and Mason

Defendants first argue that Brown's claims against Byrd-Bennett and Mason in their *official* capacities should be dismissed as redundant, because Brown is already separately suing the Board of Education. R. 16, Def.'s Mot. Dismiss at 2-3. Defendants

are right: by naming Byrd-Bennett and Mason in their official capacities[5] and also naming the Board, the complaint is really suing the Board of Education thrice over. This is true because an action brought against an individual in his official capacity "is tantamount to a claim against the government entity itself." *Guzman v. Sheahan*, 495 F.3d 852, 859 (7th Cir. 2007) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 870 (7th Cir. 1983)). When both a local governmental entity and an individual is sued in his official capacity, the suit against the officials is redundant and should be dismissed. *See Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987). So the official-capacity claims against Byrd-Bennett and Mason are dismissed.

## B. First Amendment Claim

Brown argues that, by punishing him for teaching about the word "nigger," the Board violated Brown's right to free speech under the First Amendment. Compl. ¶¶ 19-25. When it comes to government regulation of a government employee's speech, the general principle has (like many legal principles) an exception, and the exception itself might have an exception. The general principle is that the "government is entitled to restrict speech that addresses a matter of public concern 'if it can prove that the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the government employer in promoting effective and efficient public service.'" *Chaklos v. Stevens*, 560 F.3d 705, 714 (7th Cir. 2009) (quoting *McGreal v. Ostrov*, 368 F.3d 657, 675–76 (7th Cir. 2004), and citing *Pickering v. Bd. of Educ.*, 391

---

[5]Mason is also named in his individual capacity; that claim is discussed later in this opinion.

U.S. 563, 574 (1968)). In evaluating this balance of interests, courts examine any relevant facts, like whether the speech disrupted relationships with co-workers; whether the speech got in the way of the employee-speaker's performance of job duties; and the time, place, and manner of the speech. *McGreal*, 368 F.3d at 676 (citation omitted); *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1502 (7th Cir. 1994) (citations omitted).

But none of this matters if the public employee's speech is made pursuant to his or her official duties, that is, if "the employee is simply performing his or her job duties." *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006). "[W]hen public employees make statements pursuant to their official duties, [they] are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. In other words, the government may regulate public-employee speech made pursuant to official duties without triggering any First Amendment scrutiny at all; no balancing of interests, no examination of various factors, nothing. It is one thing for a public employee to speak as any other private citizen would, and therefore claim some First Amendment protection for that speech; it is another thing to speak in the performance of the public employee's job duties, because that speech can be held against, or otherwise impact, the government employer. In so holding, *Garcetti* explains that

> [e]mployers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.

*Id.* at 422-23. So one reason for permitting government regulation of an employee's official-duty speech is that the government-as-employer, just like any other employers, must have control over official job performance.[6] Another reason for courts to be hands-off here is to avoid "permanent judicial intervention in the conduct of governmental operations," because that interference would be "inconsistent with sound principles of federalism and the separation of powers." *Id.* at 423. The bottom-line is that a public employee's statements made pursuant to his or her job duties are—by definition—not made as a private citizen, and thus there is no First Amendment protection for such statements.

Here, the complaint's allegations make plain that Brown's discussion of the word "nigger" was made pursuant to his employment duties as a teacher. Brown was physically at his workplace (the class room) during work hours (the start of a sixth-grade class session) and made the statements to the intended audience of his workplace statements (the students). Accepting the complaint's allegations as true, which is required at this stage of the litigation, Brown intended to use the rap-lyrics language, including the word "nigger," as a way to teach about the power of language. The complaint can only be interpreted to allege that Brown was speaking pursuant to his job duties. So if *Garcetti*'s rule applies in full force to this academic setting, Brown's claim would be dismissed.

---

[6]Of course, there might be statutory, regulatory, or internal restrictions of the government's authority to control employee official-duty speech, *see Garcetti*, 547 U.S. at 425-26 (citing, as examples, statutory whistle-blower laws and attorney ethics rules), but the question here (and in *Garcetti*) is whether the First Amendment restricts that authority.

This brings us to the possible exception to *Garcetti*: the Supreme Court explicitly stated that the opinion did *not* try to answer whether "classroom instruction," delivered pursuant to job duties, falls outside First Amendment protection. The Supreme Court reserved the question:

> There is some argument that expression related to academic scholarship or *classroom instruction* implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.

*Id.* at 425 (emphasis added). In reserving the question, the majority in *Garcetti* was responding to one of the dissenting opinions, which complained that the majority opinion might "imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write pursuant to official duties." *Id.* at 438-39 (Souter, J., dissenting) (internal quotation marks and citations omitted). Since the time of the *Garcetti* decision, the Supreme Court has not had an occasion to address the question, nor has the Court actually ever outright held that public teachers enjoy First Amendment protection of classroom-instruction freedom at educational grades *below* colleges and universities.

Because the Supreme Court has not decided these questions, Seventh Circuit (and of course Supreme Court) decisions on academic freedom remain in place and binding on this Court—even though *Garcetti* casts doubt on the availability of First Amendment protection for teacher speech (including classroom instruction) made pursuant to job duties. In our hierarchical judiciary, it is up to the court of appeals (or

9

the Supreme Court), *see Rodriguez de Quijas v. Shearson/Am. Express*, 490 U.S. 477, 484 (1989), to overrule its prior precedents, even if they seem to rely on now-invalid grounds. So Seventh Circuit decisions that recognize that there *is* such a thing as First Amendment protection of classroom instruction remain controlling on this district court.

Those decisions do interpret the First Amendment as providing some level of protection for teachers' speech in the form of classroom instruction, but the protection is balanced against substantial deference to schools in controlling the content of the instruction, *especially* instructional content for those students who are not yet college-age. *Webster v. New Lenox Sch. Dist. No. 122*, 917 F.2d 1004, 1007 (7th Cir. 1990) ("[S]econdary school teachers occupy a unique position for influencing secondary school students, thus creating a concomitant power in school authorities to choose the teachers and regulate their pedagogical methods." (citation omitted)). That the discretion of teachers is curtailed in this way should not be surprising in light of the context in which the Supreme Court recognized the right, a context which did *not* directly involve instructional content. Instead, the fountainhead of teacher academic freedom is a line of cases in which the Supreme Court rejected State attempts to regulate the *associational* freedoms of teachers, regulations that threatened to "cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of the Univ. of the State of New York*, 385 U.S. 589, 603 (1967). The State laws and regulations included: signing a certificate stating that the university teacher was not a Communist, *id.* at 592; disclosing every organizational tie, both current and for the past five years,

10

*Shelton v. Tucker*, 364 U.S. 479, 480-81 (1960) (cited by *Keyishian*, 385 U.S. at 603); disclosing "subversive" activities, such as membership in the Communist Party, and disclosing whether the university professor taught socialism, *Sweezy v. New Hampshire*, 354 U.S. 234, 243-44 (1957) (cited by *Keyishian*, 385 U.S. at 603); and requiring an oath in which the teacher swore that the teacher had not been a member of a "subversive" or "Communist-front" organization, *Wieman v. Updegraff*, 344 U.S. 183, 194 (1952) (Frankfurter, J., concurring) (cited by *Keyishian*, 385 U.S. at 601 n.10, and *Shelton*, 364 U.S. at 487). The focus of the State intrusions in those cases was on the associational freedom of teachers, and the regulations had an obvious viewpoint discrimination.

Brown's case presents a very different context. The Board did not try to punish him for belonging to a disfavored organization (or, for that matter, any organization); the Board did not disfavor a particular viewpoint about the word, but rather barred the use of the word itself; and the Board is responsible for teaching students younger than those attending college. In this non-college, primary-secondary school setting, generally speaking, "public-school teachers must hew to the approach prescribed by principals (and others higher up in the chain of authority)." *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (citation omitted); *see also Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir. 1972) ("[A]cademic freedom [is not] a license for uncontrolled expression at variance with established curricular contents . . . ."). This is because "the school system does not 'regulate' teachers' speech so much as it *hires* that speech," and because the attendance of the students who are subject to that

11

speech is compulsory (unlike college students, who choose to go). *Mayer*, 474 F.3d at 479-80. "The Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials." *Id*. at 480. This is all the more true where the "captive audience" is comprised of younger students. *See Webster*, 917 F.2d at 1007; *Zykan v. Warsaw*, 631 F.2d 1300, 1304 (7th Cir. 1980) ("A junior high school student's immature stage of intellectual development imposes a heightened responsibility upon the school board to control the curriculum.").

Although school boards do enjoy substantial deference in setting instructional content, the Seventh Circuit has explained "that the discretion lodged in school boards is not completely unfettered." *Webster*, 917 F.2d at 1007. In discussing the limits on school-board authority, the Seventh Circuit described three principles: First, "school boards may not fire teachers for random classroom comments." *Id*. (citing *Zykan v. Warsaw Comty. Sch. Corp.*, 631 F.2d 1300, 1305 (7th Cir. 1980)). *Zykan* in turn cited *Sterzing v. Fort Bend Indep. Sch. Dist.*, 376 F. Supp. 657 (S.D. Tex. 1972), *vacated on other grounds*, 496 F.2d 92, 93 (5th Cir. 1974) (*per curiam*), in which the district court held that a school board violated a teacher's First Amendment and due process rights by firing him for presenting, to his high-school senior civics class, balanced statements on war and on racial prejudice, and had no advance notice that he could not teach those subjects. *See id*. at 662.

The second limiting principle described in *Webster* is that "school boards may not require instruction in a religiously inspired dogma to the exclusion of other points of view." 917 F.2d at 1007 (citing *Epperson v. Arkansas*, 393 U.S. 97, 106 (1968)). In

12

*Epperson*, the Supreme Court held that Arkansas violated the Establishment Clause by barring the teaching of the theory of evolution because it contradicted the religious views of some of the State's citizens. 393 U.S. at 107-09. The very purpose of the State was to advance a particular religious viewpoint, and the State could not regulate instructional content in that way.

*Webster* explained a third and final limiting principle, specifically, that school boards cannot "impose[] 'a pall of orthodoxy' on the offerings of the entire public school curriculum." 917 F.2d at 1008 (quoting *Keyishian*, 385 U.S. at 603). As discussed earlier, *Keyishian* rejected the New York state-university system's attempt to root out its employees' membership in purportedly "subversive" organizations by requiring employees to certify that they were not Communists.

So there are these few limits on school-board authority to set instructional content. But when teachers have tried to apply those limits, schools mostly have won in the Seventh Circuit because the school's directives in the particular case have fit within the deference those boards enjoy. It is important to note, however, that in each case where the instructional content did not run afoul of an already-set curriculum policy or other school rule, the school reacted to the teacher's conduct by actually setting a policy or rule *before* punishing the teacher. In *Mayer*, for example, the Seventh Circuit held there was no First Amendment violation where an elementary school teacher "was told that she could teach the controversy about policy toward Iraq, drawing out arguments from all perspectives, as long as she kept her opinions to herself." 474 F.3d at 480. Similarly, *Webster* held that a junior high school social-

13

studies teacher, who wanted to teach creationism, failed to state a First Amendment claim where the school superintendent instructed the teacher to stick to the curriculum and not to advocate particular religious viewpoints in class. 917 F.2d at 1005-06. The school did *not* punish the teacher after a student complained, but instead issued the instruction to the teacher without any punishment; it was the teacher who then sought injunctive and declaratory relief. *Id.* at 1006. In *Clark v. Holmes*, a university warned a professor that, among other criticisms, he overemphasized sex education in a health survey course, but the university rehired him for the next academic year. 474 F.2d at 930-31. Later, the professor was fired after disregarding the college's prior warnings, including the warning over "the proper content of the required health course." *Id.* at 931. The university did win the case—the Seventh Circuit held that there was no First Amendment violation, *id.* at 932—but again the school first set the policy over instructional content, and then fired the teacher only after he defied it. To be clear, these cases do *not* hold that there must *always* be an explicit warning to the teacher before disciplining a teacher for instructional content. For example, even the general curriculum or subject matter of the class itself could adequately set instructional content, depending on the situation. *See Piggee v. Carl Sandburg College*, 464 F.3d 667, 671 (7th Cir. 2006) ("No college or university is required to allow a chemistry professor to devote extensive classroom time to the teaching of James Joyce's demanding novel *Ulysses* . . . ."). Or speech might rise (or sink) to the level of sexual, racial, or other harassment and violate an anti-harassment policy. *See id.* at 673-74. In those

situations, the Board need not give the teacher a "free" violation of an already-set policy.

But here the complaint plausibly alleges that the Board had not set the ban on the word before seeking to punish Brown for discussing and using the word in the way in which he did. Specifically, the Board accused Brown of violating two sections of the Chicago Public Schools Policy Manual. The first is Section 3-3, which prohibits teachers from using "verbally abusive language to or in front of [a] student," Compl. ¶ 7. The second is Section 3-17, which prohibits:

> Violating School rules, Board rules, policies or procedures that result in behaviors that disrupt the orderly educational process in the classroom . . . . Any cruel, immoral, negligent, or criminal conduct or communication to a student, that caused psychological or physical harm or injury to a student.

*Id.* ¶ 8. Boiled down for this case, these rules bar a teacher's use of "abusive" language, disruption of "orderly" classroom learning, and causing psychological harm to a student. Even in the face of the Board's substantial deference in setting instructional content, Brown has stated a First Amendment claim because—taking all reasonable inferences in Brown's favor—the school did not ban, through those Manual sections, the use of the word "nigger" in the way Brown discussed it (in an effort to teach about the power of language) and before he discussed it. Those sections are just not clear enough (again, viewing the facts in Brown's favor) to have set a policy on what Brown did. Yes, the Board generally can set the policy on what Brown can teach and how he teaches it, and even on the complaint's allegations, the school's principal and the Board have now done so by directing him not to use the word. But for all that the complaint

says, which is what the dismissal-motion evaluation is limited to, the Board had not previously set a policy on the word's use in the setting in which Brown used it. So Brown stands on different footing from the teachers in *Mayer* and *Webster*, who knew what speech and instructional content was banned. The motion to dismiss Brown's First Amendment claim against the Board is denied. This does not mean Brown automatically wins on this claim, because right now the Court is limited to the complaint and its exhibits, and is viewing the allegations in Brown's favor; facts might be unearthed in discovery that show this ban on the word, in the setting that Brown used it in, has been an already-set policy (or perhaps teachers believe that Sections 3-3 or 3-17 do give advance warning as to the policy). But the claim moves forward.

## C. Qualified Immunity—First Amendment

Defendants also seek to dismiss Brown's First Amendment claim against Mason in his individual capacity on the theory that Mason is entitled to qualified immunity. Def.'s Mot. Dismiss at 8-11. Government employees performing discretionary functions are generally shielded from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Baxter v. Vigo Cnty. Sch. Corp.*, 26 F.3d 728, 737 (7th Cir. 1994) (citation omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231(2009). Put another way, the general purpose

16

of qualified immunity is "to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984) (alteration in original)).

The qualified immunity inquiry consists of two parts: (1) whether the facts alleged amount to a constitutional violation; and (2) whether the alleged violation was clearly established at the time of the conduct. *Pearson*, 555 U.S. at 232 (citation omitted). Here, Brown's individual-capacity claim against Mason fails because the alleged violation was not clearly established. Not only is there a question on whether *Garcetti* has eliminated First Amendment claims premised on teacher-speech rights, the Seventh Circuit cases discussed earlier could reasonably be interpreted to give Mason the authority to discipline Brown. The deference to schools in setting instructional content is strong, all the more so when teaching students younger than college-age. The qualified immunity doctrine "provides 'ample room for mistaken judgments' and protects all those but the 'plainly incompetent,'" *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). Thus, the alleged constitutional violation here is not "so obvious that a reasonable state actor would know what they are doing violates the Constitution." *Sibert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001) (citation omitted). Mason is entitled to qualified immunity and Brown's claim against him in his individual capacity is dismissed.

## D. Due Process Claims

Finally, Brown alleges that Defendants violated his right to due process by failing to provide him with a clear disciplinary-action complaint regarding his conduct. Compl. ¶ 28. It is unclear from Brown's allegations whether he is pursuing a substantive or procedural due process claim, so the Court will address each in turn.

### 1. Substantive Due Process

To the extent that Brown is bringing a substantive due process claim, that claim must be dismissed because there are other, more specific constitutional rights that are the potential sources of protection. It is well-settled that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing such a claim ." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (internal quotation marks omitted). Here, Brown alleges that Defendants violated his First Amendment right to free speech. Compl. ¶¶ 19-25. Because the alleged governmental interference implicates a more specific right—namely, the First Amendment right to free speech—this claim must be analyzed (as it was above) under the First Amendment. *Koutnik v. Brown*, 456 F.3d 777, 781 n.2 (7th Cir. 2006). Any substantive due process claim is dismissed.

## 2. Procedural Due Process

To the extent that Brown is pursuing a procedural due process claim, that claim must also fail. "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (internal quotation marks and citation omitted). A procedural due process claim involves two inquiries: first, whether the plaintiff was deprived of a protected liberty or property interest; and second, what process is due. *Pugel v. Bd. of Trs. of the Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004) (citations omitted).[7] The core requirement of the Due Process Clause is that an individual is heard before being deprived of life, liberty, or property. *See Loudermill*, 470 U.S. at 542. Thus, if state or local law creates a property interest in public employment, then the protected employee is entitled to notice and an opportunity to be heard before being deprived of that employment. *Id.* at 542 (citations omitted). And a plaintiff alleging that the state action was "random and unauthorized" must also demonstrate that the state's post-deprivation remedies failed to satisfy due process. *See Strasburger v. Bd. of Educ.*, 143 F.3d 351, 358 (7th Cir. 1998); *see also Parratt v. Taylor*, 451 U.S. 527, 541 (1981).

Here, Brown has failed to plead that the Board's disciplinary process fell short of the Constitution's due-process requirements. Under the test set out in *Loudermill*,

---

[7]It is not always clear when one's employment with the government constitutes a protectable property or liberty interest. But here the parties do not dispute, at least at this stage of the case, that Brown had a protectable property or liberty interest in not being suspended without pay.

the Board was only required to provide Brown with oral or written notice of the charges, an explanation of the Board's evidence, and an opportunity to explain his actions to meet its constitutional obligations. *See Loudermill*, 470 U.S. at 546 (citations omitted). All of these requirements were satisfied here. On October 17, 2011, or around two weeks after the classroom discussion, Brown received a Notice of Pre-Discipline Hearing, alerting him that of a pre-discipline hearing was scheduled for October 21, in the principal's office at Murray.[8] Pl.'s Exh. C at 1. The Notice specifically explained the charges being brought against Brown (namely, violating sections 3-3 and 3-17 of the Board's Policy Manual), and informed him that he could be represented at the hearing by a person of his choice. *Id.* at 1-2. Brown also received an Amended Notice of Disciplinary Action after the hearing took place, which informed him that he had been found in violation of Section 3-3. Pl.'s Exh. E at 1. As a result of this finding, the Board suspended Brown for five days without pay and made suggestions for improvement. *Id.*; Compl. ¶ 12. Brown was also given an opportunity to appeal, which he took on November 17, 2011. R. 11-6, Pl.'s Exh. F at 3. After a hearing at which both Brown and Mason testified, Compl. ¶ 16, Brown's appeal was denied on February 8, 2012. *Id.* ¶ 17.

Brown's allegation that the Board's process was "random and unauthorized" is unsupported by the complaint. Brown received written notice of the charges and

---

[8]Brown's complaint and other documents claim that the hearing occurred on October 25, 2011, and not October 21, as was explained in the Notice of Pre-Discipline Hearing. This discrepancy make no difference for the purposes of a procedural due process analysis.

disciplinary action taken against him before and after each hearing. *See* Pl.'s Exhs. C, E. At each step of the disciplinary process, he was given an explanation of the Board's evidence against him, as well as an opportunity to tell his side of the story. That is all that is required of the Board as far as the procedural Due Process Clause is concerned, and the fact that the Board failed to answer a number of questions raised in Brown's appeal does not amount to a constitutional deficiency. Because Brown was given adequate notice and an opportunity to be heard, he has failed to state a procedural due process claim against the Board.

Brown's complaint may be read to raise yet third type of due process claim: namely, one that alleges that the Board's policies were so vague that they failed to put Brown on notice of what types of conduct was prohibited. The Constitution requires that a legislative enactment provide people of ordinary intelligence with fair warning of the prohibited conduct in a manner that does not encourage arbitrary and discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). The vagueness doctrine is not sourced to the First Amendment, but instead is based on the Due Process Clause. *United States v. Williams*, 553 U.S. 285, 304 (2008).

Brown's complaint seems to allege an as-applied vagueness challenge to sections 3-3 and 3-17 of the Board's Policy Manual, *see* Compl. ¶ 28 ("[T]his plaintiff has been accused of a variety of infractions of the vague Chicago Public Schools Policy Manual and therefore has not been confronted with a clear and understandable complaint regarding his conduct."), but the parties did not address this issue in their briefs. At the next status hearing, Brown must be prepared to state whether he intends to pursue

an as-applied vagueness claim. If he does, then the Court will consider whether Defendants should be allowed to move to dismiss it. But, in any event, discovery must move forward on the surviving First Amendment claim. The Court also encourages the parties to start settlement negotiations before launching into discovery, and to consider whether a settlement-conference referral to the magistrate judge is appropriate.

## VII. Conclusion

As explained above, the Board's motion to dismiss [R. 16] is denied in part and granted in part. Defendants Bennett-Byrd and Mason are dismissed from the case in their official capacities, and the Board remains as the sole defendant in Brown's First Amendment claim. Principal Mason is entitled to qualified immunity as to the First Amendment claim. The status hearing of September 26, 2013 is reset to October 3, 2013, at 10 a.m.

ENTERED:


    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 25, 2013