UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LINCOLN BROWN,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>BOARD OF EDUCATION OF THE CITY OF CHICAGO,<br><br>　　　　Defendant. | No. 12 CV 1112<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Lincoln Brown, a sixth-grade teacher in the Chicago Public Schools, brought up the word "nigger" in a discussion with his students—during what ordinarily should have been a grammar lesson. The school's principal happened to walk into the classroom and heard Brown use the word. About a week later, the principal initiated disciplinary proceedings against Brown for his use of the word in the classroom. The Board of Education suspended Brown for five days. Brown alleges that he was disciplined in violation of the First Amendment, and that the Board's policies violate due process because they are impermissibly vague as applied to his conduct.

The Board moves for summary judgment on both the First Amendment and due-process claims. Brown moves for summary judgment on the due-process claim.

**I.　Background**

A court reviews cross-motions for summary judgment by "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving

party." *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014) (citation omitted). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The plaintiff has taken some liberties with the Local Rule 56.1 process, most frequently by presenting argument in his responses. In some instances, plaintiff neither admits nor denies a fact, but objects to its relevance (e.g., [96] ¶ 55); plaintiff agrees to some facts "as a general matter," but purports to deny their application to this case (e.g., *id.* ¶ 11); plaintiff occasionally asserts additional facts, while arguing against the weight to be given an undisputed fact in defendant's 56.1 Statement (e.g., *id.* ¶ 7).[1] In response to defendant's request that his responses be stricken or disregarded, Brown cites *Perez v. Thorntons*, 731 F.3d 699, 706 (7th Cir. 2013), and argues that striking his responses would be a "gotcha tactic." Local Rule 56.1 serves an important function—it organizes the evidence and identifies factual disputes—and district courts may require strict compliance with it. *Petty v. City of Chi.*, 754 F.3d 416, 420 (7th Cir. 2014); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). The tactic criticized in *Perez* was the movant's presentation of contradictory evidence, *see* 731 F.3d at 706; the court did not bless a relaxation of the rules such that judges should hunt for truffles buried in briefs, *see United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). That said, when stripped of argument, plaintiff's factual assertions are readily ascertainable.

---

[1] Citations to the record are to the district court docket entry. Page numbers are referenced by the CM/ECF header placed on filings in the district court.

I disregard arguments raised in the Local Rule 56.1 statements, and I consider defendant's facts admitted, unless plaintiff controverted the fact with citation to supporting material. Plaintiff's denial of facts as outside plaintiff's personal knowledge, e.g., [96] ¶ 14, is not proper—plaintiff's lack of personal knowledge does not mean the fact is not true. The upshot is that most of plaintiff's rhetoric in his 56.1 statements is ignored. The material facts are set forth below.

### A. Brown's Use of "Nigger" in the Classroom

In October 2011, Brown taught sixth-grade writing and social studies at Philip Murray Language Academy. [96] ¶ 4. Most of his students were African-American, and they ranged in age from eleven to thirteen years old. *Id.* ¶ 17. During class, Brown intercepted a note being passed between students. *Id.* ¶ 18. Brown no longer recalls much about the note (which student was passing it, what it said, who it was about), but does recall that it was a rap song with derogatory words, including the word "nigger." *Id.* ¶ 18; [87-1] at 17 (Brown deposition, pp. 61–63). Although he lacks any recall about the details, Brown thinks the note was part of "a bullying situation." [87-1] at 19 (Brown dep., pp. 71–72). Brown read some portion of the note aloud to the class, but stopped when he was told that the note was directed at another student. *Id.* at 17–18 (Brown dep., pp. 64–65).

Some of the students wanted Brown to read more of the note, and Brown said he did not want to read things that were morally offensive. *Id.* at 18 (Brown dep., p. 65, ll. 16–21). Many of the students chimed in and said they wanted Brown to tell

3

them what words were the ones he didn't want to say. *Id.* (Brown dep., p. 67–68).[2] Brown said the word "nigger" and told his students that they should trust him; he was using the word in the context of a teacher. [96] ¶ 20. Brown may have referenced the fact that he was not African-American, *see* [87-1] at 18 (Brown dep., p. 66, ll. 7–8), and then engaged the students in a discussion regarding the use of the word, [96] ¶ 20. Brown doesn't recall much about the discussion. [87-1] at 18 (Brown dep., p. 68, l. 7).

Brown asked his students to "explain . . . why blacks can call each other a [nigger or N-word] and not get mad, but when whites like me do it, blacks get angry." [96] ¶ 21; [87-1] at 20 (Brown dep., pp. 75–76).[3] Brown also asked his students if they "ever thought about why blacks are killed in movies first." [96-1] ¶ 21; [87-1] at 20 (Brown dep., p. 76). At some point, the discussion devolved into students using racially derogatory language about Hispanic and Muslim cab drivers, and Brown returned to his planned grammar lesson. [87-1] at 21 (Brown dep., pp. 78–79). This discussion of race and derogatory language was unplanned, and lasted forty minutes of the scheduled one-hour lesson. [96] ¶ 21. Brown was the first person to say the word "nigger" in class, and no student said the word until Brown had said it. *Id.* ¶ 22.

---

[2] Although the deposition transcripts necessarily present a stilted version of events, one can easily picture a class of preteens goading their teacher into using insulting language.

[3] Principal Gregory Mason recalled that Brown used the word when he posed this question to his students; Brown claims he used the euphemism, "N-word." [87-10] at 2; [87-1] at 20 (Brown dep., pp. 75–76).

Principal Mason walked into the classroom and heard Brown use the word in mid-sentence—Mason didn't know about a note that had been passed between students. [87-10] at 2; [96] ¶ 24. Mason stepped out of the classroom and returned about five minutes later; he observed some of Brown's discussion of race with his students. [87-10] at 2; [96] ¶¶ 24, 26. Mason thought Brown's use of the word was very strange, offensive, and shocking to hear. [96] ¶ 26. (Mason was not so shocked as to interrupt the class, but he did immediately think the matter required formal discipline. [87-2] at 27 (Mason dep., pp. 102–103).) The next day, Mason asked some of Brown's students about the use of the word in class, and one student said that Brown brought up the word "out of the blue" and further discussed the problem of bullying. [96] ¶ 28.[4] Mason did not believe any student suffered psychological or physical harm or injury. [104] ¶ 13. Brown did not intend to verbally abuse anyone, nor did any student feel verbally abused by Brown. *Id.* ¶¶ 14–15.

### B. The Board's Disciplinary Process

The Board's Employee Discipline and Due Process Policy described the conduct that exposed a teacher to discipline. The policy prohibited the following (among other things): using verbally abusive language to or in front of students (Section 3-3); violating School rules, Board rules, policies or procedures that result in behaviors that disrupt the orderly educational process in the classroom, in the school, and may occur on or off the school grounds or assigned work location (Section 3-17); using racial, cultural, ethnic, or religious epithets, or threatening

---

[4] Mason doesn't recall whether he himself used the word or a euphemism when speaking to the students. [109] ¶ 9.

5

language (Section 4-2); violating School rules, Board rules, policies or procedures that result in behaviors that *seriously* disrupt the orderly educational process in the classroom, in the school, and may occur on or off the school grounds or assigned work location (Section 4-26) (emphasis added to distinguish 4-26 from 3-17);[5] and any cruel, immoral, negligent, or criminal conduct or communication to a student, that causes psychological or physical harm or injury to a student (Section 5-9). [96] ¶ 9.

Disciplinary actions were based on various factors, including: (1) the seriousness of the offense; (2) the number of times it occurred; (3) prior acts of misconduct;[6] (4) the length of time between infractions; (5) the attitude and cooperation of the employee; (6) the employee's work history; and (7) the totality of the circumstances. *Id.* ¶¶ 8–10. Brown was aware of the Board's policy and that it applied to him. *Id.* ¶ 11.

Brown was issued a notice of a pre-discipline hearing resulting from his use of the word "nigger" in front of his students. *Id.* ¶ 50. Brown was cited for violating Sections 3-3 and 3-17 of the discipline policy. *Id*. The notice advised him that his use of the word formed the factual basis of the disciplinary charges against him. *Id*. Brown was never charged with violating Section 4-2 (using racial epithets), but was

---

[5] Discipline under Section 3 is more lenient than under Section 4. [96] ¶ 55.

[6] Earlier in 2011, Brown was suspended for one day without pay for violating Sections 4-26 and 5-9. This prior instance of discipline arose from an incident between Brown and a student. Brown saw the student wearing a backpack in the hallway (which Brown thought was against school rules), and Brown put the backpack on the ground, took its contents out of the bag, and walked away from the scene with the backpack in his hands. [96] ¶ 13; [97] at 16 (Brown dep., p. 32, ll. 6–13). Principal Mason thought this incident reflected a lack of judgment on Brown's part. [96] ¶ 15.

6

found to have violated Section 3-3 (using verbally abusive language to or in front of students). *Id.* ¶¶ 52–53; [104] ¶ 1. The Section 3-17 charge was dropped at this stage of the disciplinary process. [104] ¶ 4.

Principal Mason issued a five-day suspension against Brown; on appeal, the Board concluded that a suspension of five days was appropriate for Brown's use of the word on October 4, 2011, and it entered a substantiated finding of misconduct under Sections 3-3 and 3-17 of the discipline policy. [96] ¶¶ 54, 57.

### C. Other Uses of the Word in the Chicago Public Schools

The Board says the word "nigger" cannot be used at any time for any reason in any classroom in the Chicago Public Schools. [87-4] at 19 (Krieger dep., p. 71, ll. 17–21). According to Brown, earlier in his career at CPS (before he taught at Murray), he had taught *Adventures of Huckleberry Finn* and used the word in class. [87-1] at 18–19 (Brown dep., pp. 68, 70). He had not discussed his use of the word with his superiors. *Id.* at 19 (Brown dep., pp. 69–79). The Murray school librarian does not teach classes and does not receive, review, or approve teachers' lesson plans or class assignments. [109] ¶ 7. Nevertheless, the librarian is aware that the following books are in the Murray library, and that they contain the word: *To Kill A Mockingbird*; *War Comes to Willy Freeman*; *Adventures of Huckleberry Finn*; *Lord Jim*; *Lord of the Flies*. [99] at 2.

Principal Mason authorized a school-organized field trip for students to see the movie *Red Tails* in February 2012. The movie was rated PG-13 and is a drama about the Tuskegee Airmen—the word is used in the movie. Mason had not seen the

7

movie, and did not know that the word was in it. Had he known, he would not have authorized the trip. [109] ¶¶ 1–3. A group of Murray parents organized a viewing of the movie *42* (a biographical movie about Jackie Robinson that came out in 2013, and in which the word is used many times) at a nearby theater. *Id.* ¶ 6; *see* http://www.imdb.com/title/tt0453562/ (visited March 26, 2015).[7] Mason denies authorizing or sponsoring the *42* outing, which occurred off-site and after school hours. [109] ¶ 6.

## II. First Amendment

The Board suspended Brown for five days because of the words he used—there's no dispute about that. Brown's position is that he used the word in a so-called "teachable moment," without hostility, and therefore the First Amendment prohibited the Board from disciplining him—and that even if the Board had the power to discipline, its exercise of that power over Brown was wrong. Whether the Board properly exercised disciplinary authority is a due-process issue, not a First Amendment one. The First Amendment issue is whether the Board's regulation of Brown's speech is prohibited. And on that front, the Board maintains that "teachable moment" or no, the First Amendment does not prohibit the Board from disciplining a teacher-employee for his speech in the classroom. The Board is correct.

---

[7] Brown thinks it was the Murray PTO that organized the outing, but he doesn't know for sure. [97] at 26–27 (Brown dep., pp. 308–09). Mason says the *42* outing was not school-sponsored. [109] ¶ 5.

Public employers can regulate the speech of their employees without regard to First Amendment limits when the speech at issue is uttered in the course of the employee's duties. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The Court said it was not deciding whether its rule applied in the same manner to speech related to scholarship or teaching. *Id.* at 425. But the court of appeals said "*Garcetti* applies directly" to a claim by a school teacher that she was dismissed for expressing certain views in the classroom. *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007). In denying the motion to dismiss in this case, the court held that some factual development was necessary to clarify whether the Board's ban on the word (in the context Brown used it) was in place before Brown's suspension. *Brown v. Chi. Bd. of Educ.*, 973 F.Supp.2d 870, 879–80 (N.D. Ill. 2013).

There is now no dispute that teachers may not use racial, cultural, and ethnic epithets in the classroom; this policy was in place before Brown's conduct in this case; and Brown knew it. [96] ¶¶ 9, 11. While it's true that the Board did not invoke this prohibition when disciplining Brown, and Brown argues that it is irrational to discipline him for using the word in a non-hostile manner, these points are not relevant to the First Amendment claim. The context of Brown's word usage may mitigate its offensiveness, and the Board's slipshod selection of policy violations may give one pause about the process it used. But there is no doubt that speech related to racial, cultural, and ethnic epithets was subject to regulation.[8] Moreover,

---

[8] The Board argues that the word at issue here is always an epithet, no matter its context. The first definition of "epithet" in the online Merriam-Webster dictionary is "a characterizing word or phrase accompanying or occurring in place of the name of a person or thing." http://www.merriam-webster.com/dictionary/epithet (visited March 26, 2015).

9

there is no First Amendment basis to require more precise advance notice to Brown. Under *Mayer*, 474 F.3d at 480, "the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system." There is no dispute that Brown departed from his grammar lesson; and when he did that, he ran the risk that his speech would run afoul of the Board's preferences, even if his speech were otherwise commendable. The First Amendment did not prohibit the Board from taking action against Brown.

Whether the Board invoked the correct policy when disciplining Brown is not a First Amendment question. Whether the Board overreacted when suspending Brown is not a First Amendment question either. And the Board's claim that it has banned a word from usage in any and all contexts (coupled with Brown's evidence that the word exists within the CPS environment) does not raise a material question of fact under the First Amendment. The correct question here is whether the First Amendment prohibited the Board from exercising its judgment to discipline a teacher for the racially-charged words he used when teaching. The answer is no. Brown knew that his speech was subject to regulation, including in the area of racial and cultural language, and so under *Mayer* and *Garcetti*, the

---

This definition does not include a negative connotation. The second definition is "a disparaging or abusive word or phrase." *Id*. There is no dispute that when Brown used the word, he was invoking both its disparaging character as well as its more nuanced usage in popular culture. Brown used the word as an epithet even though he did not intend to disparage or abuse anyone.

10

Board did not violate the First Amendment when it disciplined him. The Board's motion for summary judgment on the First Amendment claim is granted.

Brown's response to the Board's motion for summary judgment is largely a criticism of the process used—the Board was sloppy, the sections of the policy invoked by the Board did not apply to Brown's conduct, and Brown appropriately seized the day to teach his students about civil discourse only to be punished by his employer—but these points sound in due process, not the First Amendment.

### III. Due Process

Brown alleges that the Board's disciplinary rules as applied to him violated substantive due process because they were hopelessly vague. *See Brown*, 973 F.Supp.2d at 882–83 (dismissing procedural due process claims, but allowing void-for-vagueness challenge to proceed). Both parties move for summary judgment on Brown's due-process claim.

"Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). But if a statute, or in this case a disciplinary rule, fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," or does not provide "fair warning" of proscribed conduct, it is void for vagueness. *Id.* at 108. In an as-applied challenge, if the context of the case leads one to guess at whether the rule applies to the conduct, then the rule is void for vagueness. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–49 (1991).

11

The void-for-vagueness doctrine is based on substantive due process, but in certain applications it touches on First Amendment concerns. *See United States v. Williams*, 553 U.S. 285, 304 (2008). For present purposes, however, it suffices to note that the First Amendment interests in this case are not weighty. As discussed above, under *Mayer* and *Garcetti*, Brown's speech was not protected by the First Amendment, and government employers may use broad standards to define employee conduct. *See Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion).[9] Where the penalties for noncompliance are less severe, a high level of clarity in the policy or rule is not required. *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 785 (7th Cir. 2011) (distinguishing a code of conduct at a senior center from statutes and ordinances). The "government acting in the role of employer enjoys much more latitude in crafting reasonable work regulations for its employees." *Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir. 2000).

Brown was charged with violating Sections 3-3 and 3-17 of the disciplinary policy. He was not charged with violating Section 4-2 (prohibiting the use of racial epithets). Therefore, to succeed on his motion for summary judgment, Brown must demonstrate that there was no reasonable opportunity to know that Sections 3-3 and 3-17 proscribed his conduct. Section 4-2 is not irrelevant to the analysis, however, because Section 3-17 incorporates all of the Board's policies. Section 3-17 subjects to discipline any employee who violates any rule in a manner that results

---

[9] The Constitution is not the sole source of remedies for a poor decision by a government employer. An employee "may be able to challenge the substantive accuracy of the employer's factual conclusions under state contract law, or under some state statute or common-law cause of action." *Waters*, 511 U.S. at 679.

in classroom disruption. The use of a racial epithet (a violation of Section 4-2) in a manner that resulted in a classroom disruption falls within Section 3-17's prohibition.

Brown was not verbally abusing anyone or causing disruptive behavior in the classroom—he was attempting to diffuse a disruptive situation. In return, he was written up for "using verbally abusive language to or in front of students" (Section 3-3), and "violating School rules, Board rules, policies or procedures that result in behaviors that disrupt the orderly educational process in the classroom" (Section 3-17).

That Brown may have been innocent of the charges does not mean that the charges were unconstitutionally vague. A "regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *F.C.C. v. Fox Television Stations, Inc.*, — U.S. —, 132 S.Ct. 2307, 2317 (2012) (citation omitted). Brown's motion for summary judgment largely explains why he should not have been disciplined at all, but the constitutional question is different. Was he unfairly surprised to be hauled into a hearing on the grounds that he used abusive language or violated a rule resulting in disruptive behavior? He used a loaded, offensive epithet (albeit in a ham-handed attempt to teach his students about civility), and his students reacted by diverting the class into a discussion of other racially and religiously offensive terms. He knew that he was treading on sensitive territory—he asked his students to trust him. He also knew from his prior discipline under Section 4-26 that discipline for policy

violations that lead to disruptions can cover a wide range of behavior. Any surprise he experienced by the invocation of Sections 3-3 and 3-17 was not unfair.[10] The word can be abusive and its use can be a violation of Board policies and lead to classroom disruption; it is therefore not unconstitutionally surprising to apply these provisions to a teacher who uses the word in a class discussion and causes a digression into racial stereotyping and a significant departure from the lesson plan. Unlike *F.C.C. v. Fox*, 132 S.Ct. at 2318, where regulators changed course and surprised television broadcasters by claiming that fleeting expletives were actionably indecent, here, applying the broad prohibition on abusive language and classroom disruption to Brown's conduct was not a novel twist on established practice.

The prohibitions at issue here are no more specific than necessary for workplace codes of conduct, and they are not vague as applied. The Board may not have proven that Brown's language was verbally abusive, and it may not have proven that he caused a disruption by violating a policy, but he was on fair notice that he could be disciplined for using an epithet in a non-approved, sensitive discussion that disrupted his planned grammar lesson.

---

[10] Principal Mason decided to drop the Section 3-17 charge, [96] ¶ 52, but the Board reinstated it. [96] ¶ 57. There was some sloppiness in how this happened, *see* [96] ¶ 56, but this sloppiness does not shed light on whether the language of Section 3-17 is unconstitutionally vague as applied to Brown.

## IV. Conclusion

The Board may have been unwise in determining that Brown's use of a racial epithet in a non-hostile manner warranted a five-day suspension. But its conduct was not unconstitutional. Plaintiff's cross-motion for summary judgment [94] is denied, and defendant's motion for summary judgment [85] is granted. Enter judgment in favor of defendant, and terminate civil case.

ENTER:

                                                                            Manish S. Shah
                                                                            United States District Judge

Date: 3/26/15