CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 15-1857

LINCOLN BROWN,

*Plaintiff-Appellant*,

*v.*

CHICAGO BOARD OF EDUCATION,

*Defendant-Appellee*.

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 1112 — **Manish S. Shah**, *Judge*.

————————————

ARGUED FEBRUARY 23, 2016 — DECIDED JUNE 2, 2016

————————————

Before WOOD, *Chief Judge*, and SYKES and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Justice Scalia once said that he wished all federal judges were given a stamp that read "stupid but constitutional." See Jennifer Senior, *In Conversation: Antonin Scalia*, NEW YORK MAGAZINE, Oct. 6, 2013. As he was implying, not everything that is undesirable, annoying, or even harmful amounts to a violation of the law, much less a constitutional

problem. Today's case provides another illustration of that fact.

The Chicago Board of Education has a written policy that forbids teachers from using racial epithets in front of students, no matter what the purpose. Lincoln Brown, a sixth grade teacher at Murray Language Academy, a Chicago Public School, caught his students passing a note in class. The note contained, among other things, music lyrics with the offensive word "nigger." Brown used this episode as an opportunity to conduct what appears to have been a well-intentioned but poorly executed discussion of why such words are hurtful and must not be used. The school principal, Gregory Mason, happened to observe the lesson. Brown was soon suspended and brought this suit under 42 U.S.C. § 1983 against the Board and various school personnel.

The district court dismissed a number of counts under Federal Rule of Civil Procedure 12(b)(6), and Brown has not pursued them further. But two of his theories of relief proceeded to summary judgment: that his suspension violated his First Amendment rights, and that the school's policy was so vague that his suspension violated the substantive due process component of the Fourteenth Amendment. The district court granted summary judgment to the Board on both. Brown appeals. Because Brown's suspension did not violate his constitutional rights, we affirm.

## I

Brown's First Amendment claim fails right out of the gate. Public-employee speech is subject to a special set of rules for First Amendment purposes. Whether a public employee's speech is constitutionally protected depends on "whether the

employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); see *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). If the speaker is not wearing her hat "as a citizen," or if she is not speaking "on a matter of public concern," then the First Amendment does not protect her. See, *e.g., Garcetti*, 547 U.S. at 421; *Connick v. Myers*, 461 U.S. 138 (1983).

In the case before us, Brown himself has emphasized that he was speaking as a teacher—that is to say, as an employee—not as a citizen. An employee does not speak as a citizen when he "make[s] statements pursuant to [his] official duties." *Garcetti*, 547 U.S. at 421. The question remains whether the *Garcetti* rule applies in the same way to "a case involving speech related to scholarship or teaching." *Id.* at 425. The Supreme Court had no need to address that issue, and so left it for another day.

This is not our first opportunity, however, in which to confront that question. See *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007). In *Mayer*, we concluded that a teacher's in-classroom speech is not the speech of a "citizen" for First Amendment purposes. *Id.* at 479. The core of the teacher's job is to speak in the classroom on the subjects she is expected to teach. This meant, we thought, that in-classroom instruction necessarily constitutes "statements pursuant to [the teacher's] official duties." *Id.* (internal quotation marks omitted) (quoting *Garcetti*, 547 U.S. at 418).

Here, Brown gave his impromptu lesson on racial epithets in the course of his regular grammar lesson to a sixth grade class. His speech was therefore pursuant to his official duties. That he deviated from the official curriculum does not change this fact. See *Mayer*, 474 F.3d at 479 (expressing anti-war views

during event is unprotected employee speech); *Fairley v. Andrews*, 578 F.3d 518, 523 (7th Cir. 2009) (posting improper notices on work bulletin board would be unprotected employee speech); *Piggee v. Carl Sandburg Coll.*, 464 F.3d 667, 670–71 (7th Cir. 2006) (expressing homophobic views at school outside of class is unprotected employee speech). Moreover, maintaining classroom order is one of Brown's most basic duties as a teacher. See *Weintraub v. New York Bd. of Educ.*, 593 F.3d 196, 198 (2d Cir. 2010) ("core duties" of teachers include "maintaining class discipline"). To the extent that Brown's discussion of racial slurs was an attempt to quell student misbehavior, it was still pursuant to his official duties.

Brown argues that we should ignore *Mayer* and instead follow the Ninth Circuit by understanding the Supreme Court's reservation as a hint that *Garcetti* should not apply "in the same manner to a case involving speech related to scholarship or teaching." *Garcetti*, 547 U.S. at 425; see *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014). But *Demers* addressed speech in a university setting, not a primary or secondary school. It relied on the long-standing recognition that academic freedom in a university is "a special concern of the First Amendment" because of the university's unique role in participating in and fostering a marketplace of ideas. See *Demers*, 746 F.3d at 411 (internal quotation marks omitted) (quoting *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967)). (*Demers* also did not comment on the extent to which, at the university level, the institution may have separate interests from those of its faculty.) In fact, in the primary and secondary school context, the Ninth Circuit follows *Mayer*'s approach. See *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 962–63 (9th Cir. 2011) (holding in-classroom instruction is pursuant to teacher's official duties and unprotected

employee speech). So do the Third and Sixth Circuits. *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332 (6th Cir. 2010); *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) (Alito, J.) (pre-*Garcetti*). Only the Fourth Circuit has adopted the position that Brown advocates, and it did so without analysis. *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007). We see no reason to depart here from our decision in *Mayer*. Brown made his comments as a teacher, not a citizen, and so his suspension does not implicate his First Amendment rights.

## II

We must explain the facts in a little more detail to set the stage for Brown's due process claim. Following the incident in question, Brown received a notice of a pre-discipline hearing. This notice cited him for violating Sections 3-3 and 3-17 of the Employee Discipline and Due Process Policy. Section 3-3 of the Policy prohibits "[u]sing verbally abusive language to or in front of students." Section 3-17 prohibits "[v]iolating School rules, Board rules, policies or procedures that result in behaviors that disrupt the orderly educational process in the classroom, in the school, and may occur on or off the school grounds or assigned work location." Because Section 3-17 incorporates violations of any other school rules, it sweeps in Section 4-2, a rule that prohibits "using racial, cultural, ethnic, or religious epithets, or threatening language."

After the notice of preliminary hearing was issued, Principal Mason dropped the charges based on Section 3-17. He suspended Brown for five days based solely on the Section 3-3 charge of use of verbally abusive language. Brown appealed this decision to the Board. The Board reinstated the general charge under Section 3-17 (a step it was authorized to take),

entered a finding of misconduct under both Sections 3-3 and
3-17, and agreed that a five-day suspension was appropriate.
Brown acknowledges that he had actual knowledge of the
Policy prior to this incident, and he has not raised any com-
plaint about procedural due process in this court. He asserts
only that these rules, taken together, are so vague that they
cannot be applied consistently with the Due Process Clause.

A statute, or in this case, a policy, is impermissibly vague
if it "fails to provide a person of ordinary intelligence fair no-
tice of what is prohibited." *FCC v. Fox Television Stations, Inc.*,
132 S. Ct. 2307, 2317 (2012) (internal quotation marks omitted)
(quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).
Brown presents two arguments in support of his vagueness
theory. First, he says that the term "racial … epithet" in Sec-
tion 4-2 is too vague to provide fair notice that his language
was prohibited. He would prefer that the Board provide a list
of banned words. Basic knowledge of American culture is suf-
ficient to reject this argument. The word "nigger" is one of the
most reviled in American English. It is the archetypal racial
epithet. Moreover, Brown's actions indicate that he knew this
to be the case—why else would he interrupt his planned
grammar lesson to lead a discussion on why the word is in-
appropriate?

The law buttresses this commonsensical observation. A
statute need not define every term to survive a vagueness
challenge. See *United States Civil Serv. Comm'n v. Nat'l Ass'n of
Letter Carriers*, 413 U.S. 548 (1973); *Broadrick v. Oklahoma*, 413
U.S. 601 (1973); see also *United States v. Lanier*, 520 U.S. 259,
271 (1997). Moreover, an employee code of conduct need not
be as clear as a criminal law. *Greer v. Amesqua*, 212 F.3d 358,
369 (7th Cir. 2000) (employee discipline code); see also *Bethel*

No. 15-1857                                                    7

*Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) (student discipline code). The policy gave adequate warning that Brown's use of that word was prohibited.

Brown's real frustration seems to be that the policy does not distinguish between using the word in an educational manner from its use as a slur directed toward a student or colleague. While we understand his frustration, his only solace is in Justice Scalia's stamp. Regardless of what he believes the Policy *should* be, the Policy in force forbids using such language "in front of students," rather than merely forbidding using language directed *toward* students. His disagreement with the Policy does not render it impermissibly vague.

Second, Brown argues that the Board had a past policy of non-enforcement when the word was used educationally. He contends that this means he lacked sufficient notice that the Board would enforce the policy against him in this instance. Brown points to several instances where students heard the word with the school's tacit approval: he taught *Adventures of Huckleberry Finn* at another Chicago public school, his current school organized a field trip to see *Red Tails*, a movie about African-American pilots in World War II, and the Parent-Teacher Organization organized a showing of *42*, a movie about Jackie Robinson. The book and the two movies all use the word in question (and do so repeatedly). Furthermore, Principal Mason admits that he might have used the word when asking students about what occurred in Brown's classroom—more indication that the Policy was not as strict as the Board now claims it is.

The Supreme Court accepted an argument similar to Brown's in *Fox Television Stations, Inc.* In that case, the FCC had a long-standing written policy that it would not fine TV

networks for "isolated or fleeting" expletives or nudity. 132 S. Ct. at 2313. Then the Commission abruptly changed course and, without announcing its new policy, fined two networks for brief nudity and swearing. *Id.* at 2317. Because the Commission had not given advance notice of this change, the Court held that it "failed to give" the networks "fair notice" of the impermissible conduct. *Id.* at 2320.

But *Fox* does not save Brown's case. Unlike the FCC, the Board had no formal policy of not enforcing its Policy in certain circumstances. A handful of instances of past non-enforcement is a far cry from the FCC's written, formal policy of non-enforcement in *Fox*, and is insufficient to render the Policy so vague that an ordinary person would not know what it prohibits. See *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 424 (6th Cir. 2014) (holding statute not void for vagueness where plaintiff "does not point to any non-enforcement policy … from which [this enforcement action] marks an abrupt change," unlike in *Fox*). Brown's surprise, along with a few episodes of non-enforcement, does not support a substantive due process claim.

### III

Brown is indignant that he was suspended for using a racial slur while attempting to teach his students why such language is inappropriate. His frustration is understandable, but it is not legally actionable. This is really a First Amendment case, which gains nothing from the addition of the substantive due process argument. And from a First Amendment standpoint, *Garcetti* dooms his position. The Board may have acted in a short-sighted way when it suspended him for his effort to educate the students about a sensitive and socially important

issue, but it did not trample on his First Amendment rights. We therefore AFFIRM the judgment of the district court.